IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Case No.: 2:16-CR-431-WKW-WC |
| | ) |
| LEOPOLDO RAMOS, JR. | ) |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Defendant Leopoldo Ramos, Jr. ("Defendant Ramos") is charged with violations of 21 U.S.C. § 841(a)(1), possession with intent to distribute "powder cocaine," and 18 U.S.C. § 846, conspiracy to possess with intent to distribute "powder cocaine." Doc. 32. Evidence of those alleged crimes was seized after the vehicle in which Defendant was traveling was stopped and subsequently searched. Defendant filed a Motion to Suppress (Doc. 46), which is currently pending before the court. Defendant's motion seeks an order suppressing "all tangible and testimonial evidence recovered as a result of an unlawful traffic stop and unreasonable detention[.]" Def.'s Mot. (Doc. 46) at 1. Defendant argues the evidence against him should be suppressed because: (1) there was no probable cause or reasonable suspicion to justify the traffic stop, and (2) the time needed to effectuate the alleged traffic violation was exceeded, morphing the stop into an unlawful seizure. *Id*. at 3-8.

The Government responded (Doc. 52) to the motion and, on October 20, 2016, the undersigned conducted a suppression hearing on the matter at which the Government presented testimony and evidence in support of the lawfulness of the stop and detention of

Defendant prior to the search of his vehicle.  The matter is now ripe for report and recommendation to the District Judge.  Upon consideration of Defendant's motion, the Government's response, and the evidence and testimony adduced at the suppression hearing, the undersigned Magistrate Judge RECOMMENDS that Defendant's motion to suppress be DENIED.

I.      FINDINGS OF FACT[1]

On August 24, 2016, Chris Faulk ("Trooper Faulk"), an officer with the Alabama Law Enforcement Agency's ("ALEA") felony apprehension patrol ("FAP") team, was stationed on Interstate 85 North ("I-85 N") around mile marker sixteen.  Suppression Hearing Transcript ("Tr.") (Doc. 57) at 4:19-5:18.  While observing traffic, Officer Faulk noticed a white Ford pickup truck, bearing Texas license plates, traveling northbound.  *Id*. at 5:19-23.  Within a minute of observing the white pickup truck, Trooper Faulk observed a maroon Texas-plated truck pass.  *Id*. at 5:34-24.  According to Trooper Faulk, the two trucks "had mimicking movements on the highway," *id.* at 6:4, in that both trucks moved over when they passed his position.  Trooper Faulk suspected that the vehicles were traveling together, and he began to follow the vehicles to investigate further.  *Id*. at 6:3-11.

During Trooper Faulk's rolling investigation of the vehicles, he learned from the Blue Lightning Operation Center ("BLOC")[2] that the white pickup truck had crossed the

---

[1] The court reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

[2] BLOC provides law enforcement with the ability to run criminal histories, check border crossings, and determine if vehicles and/or individuals were previously involved in illegal activities.  *Id*. at 9:25-10:4.

2

Falfurrias, Texas, United States Customs and Border Protection checkpoint at approximately 4:00 p.m. the previous day. *Id*. at 10:16-22. Upon receiving that information, Trooper Faulk initiated a Vigilant[3] system check for tag reads from other officers across the southeastern corridor. *Id*. at 11:21-12:1. Trooper Faulk received information from Vigilant that the white pickup truck had been spotted in Mississippi. *Id*. at 12:1-3. Based upon this information, Trooper Faulk surmised that the truck was taking a long-way, straight trip from South Texas. *Id*. at 12:4-11. Based upon his own observations, his hunch that criminal activity might be afoot, and the information he learned from his BLOC and Vigilant checks, Trooper Faulk requested that Officer Carswell, whom he had spoken with earlier and knew to be in the Opelika area, prepare to render assistance in the event that Trooper Faulk stopped one of the vehicles. *Id.* at 9:3-9.

Officer Carswell positioned his cruiser on the shoulder of Interstate 85 near mile marker fifty-eight, in the area preceding an on-ramp utilized by vehicles merging onto the interstate. *Id.* at 12:20-23. As Trooper Faulk was approaching Officer Carswell's position, his view of the white pickup truck was mostly obscured by a tractor-trailer that was behind the pickup truck in the right-hand lane. There was another tractor-trailer attempting to pass the white pickup truck in the left lane. *Id.* at 12:20-13:4. Trooper Faulk observed that, as the white pickup truck approached Officer Carswell's position, it began to move over from the right lane to the left lane. The passing tractor-trailer swerved in the left lane in response.

---

[3] The Vigilant system is a camera system that captures letters and numbers from license plates. *Id*. at 10:9-11. An officer investigating a vehicle is provided tag reads from other officers regarding the prior locations of that vehicle. *Id*. at 10:9-15; 11:25-12:6.

*Id.* Trooper Faulk testified that he observed that the white pickup truck "overcorrected, and went all the way back into the lane, crossed over the striated lines" where the on-ramp merges with Interstate 85. *Id.* Trooper Faulk then hit record on his police vehicle's dashboard camera and turned on his blue lights to initiate a traffic stop. *Id*. at 14:5-15. In addition, as Trooper Faulk approached the white pickup truck to make the stop, he observed the white pickup truck "riding on the white" fog line, which would constitute another, separate violation of Alabama's improper lane usage law. *Id*. at 15:5-10.

Upon approaching Defendant's vehicle, Trooper Faulk noticed several circumstances that, based upon his training in drug interdiction, he deemed suspicious. First, he "noticed several tools in the back that appeared to be staged, not being used." *Id.* at 15:22-23. He surmised the vehicle's occupants "were trying to make it look like they were going to do construction work. But looking at tools, the rusty tools and everything that hasn't been moved, that's been sitting in the bed for quite some time, I knew—I believed that the vehicle wasn't being used for construction." *Id.* at 16:7-11. When Trooper Faulk asked Defendant for his license and registration, Trooper Faulk observed that Defendant's hands were very shaky and trembling. *Id.* at 21:11-12, 21:24-25. He believed Defendant was displaying higher levels of anxiety than persons in ordinary traffic stops. *Id.* at 22:9-10. Trooper Faulk also observed that Defendant's passenger, co-Defendant Jennifer Everett, was so nervous that, due to the nature of her clothing, he could see "her heart beating at the []top of her stomach[.]" *Id.* at 24:1-5.

A camera mounted in Trooper Faulk's vehicle recorded his interactions with Defendant and Everett and the recording was entered into evidence at the suppression

4

hearing. Gov't's Ex. 4. At approximately 1:10[4] in the video, Trooper Faulk stops the white pickup truck. *Id.* He approaches the passenger side of the vehicle and asks for the vehicle's registration and the driver's license. *Id.* at 1:28. Defendant, who is driving the vehicle, gives Trooper Faulk the requested documents, *id.* at 2:18, and exits the vehicle upon Trooper Faulk's request, stopping briefly by the bed of the white pickup truck, *id.* at 2:22. There, Trooper Faulk informs Defendant that he is being stopped because he crossed over the dotted lines as he passed the previous exit. *Id.* at 2:30. Defendant explains that he was trying to move over because of Officer Carswell's parked vehicle, but that there was a tractor trailer in the left lane which caused him to swerve back to his lane. *Id.* at 2:46. Trooper Faulk instructs Defendant to sit in the passenger seat of his police vehicle, and Defendant complies. *Id.* at 2:52.[5]

While in Trooper Faulk's vehicle, Trooper Faulk questions Defendant regarding his travel plans and his line of work. *Id.* at 3:40. Defendant states that he works for his uncle laying tile, and that he is traveling to a job site in Durham, North Carolina. *Id.* at 3:48. Defendant states that the vehicle is registered to Octavio Garza, his uncle. *Id.* at 4:12. Defendant further states that he has driven the vehicle straight from Houston, Texas. *Id.* at

---

[4] The court will use the above-styled, "minute:second" format to designate the time at which relevant events occurred on the dash-cam video. As a point of clarification, this format does not indicate the time of day that the events occurred.

[5] Another suspicious circumstance observed by Trooper Faulk pertained to the insurance information provided by Defendant. Trooper Faulk observed that the insurance purchased for the truck covered just one month. Tr. (Doc. 57) at 23:11-12. Based upon his drug interdiction training, Trooper Faulk knew that persons involved in drug trafficking often purchase insurance for shorter than the customary three, six, or twelve month intervals due to a fear that the vehicle might be lost to law enforcement. *Id.* at 23:12-20.

5

4:25.  Trooper Faulk then asks Defendant about the passenger in his vehicle, to which Defendant states that she is a friend whom he picked up in Virginia a couple of weeks prior to the stop.  *Id*. at 4:45.

Trooper Faulk exits the police vehicle and approaches the passenger, Everett.  *Id*. at 5:43.  He requests identification from Everett, *id.* at 5:50, and asks her where the two are heading, to which she replies that she does not know.  *Id*. at 6:12.  She states that Defendant picked her up a couple of weeks ago at college in Mississippi, and Trooper Faulk confirms her statement.  *Id*. at 7:46.

Trooper Faulk returns to his vehicle where Defendant remains in the passenger seat.  *Id*. at 8:16.  Trooper Faulk asks Defendant again where he picked up his passenger.  *Id*. at 8:29.  Defendant confirms that he picked her up a couple of weeks prior in Virginia in his GMC four-door pickup truck.  *Id*. at 8:38, 8:53, 10:53.  When questioned where his truck was at the moment, Defendant states that it is in Houston.  *Id*. at 12:12.  At this time, Trooper Faulk knows that Defendant's truck is not in Houston, but that it is in fact the other truck he observed traveling with Defendant, and that it has been stopped by Officer Carswell.  Tr. (Doc. 57) at 29:22-30:4.  Trooper Faulk exits his vehicle, and can be heard communicating with Officer Carswell, to whom he states that one of the trucks is loaded, and directs him to not let the other truck go.  Ex. 4 at 12:28.

As reflected herein, the video evidence indicates that Trooper Faulk obtained all of the above information within about twelve minutes of his initiating the traffic stop.  Trooper Faulk testified that his questioning of Defendant and Everett about their itinerary and related events occurred while he was "in the process of running his paperwork and

6

checking out and making sure [Defendant] doesn't have any active warrants or anything like that[.]" Tr. (Doc. 57) at 63:21-24.

After speaking briefly with Officer Carswell outside of his vehicle, Trooper Faulk re-enters his vehicle and informs Defendant that he is going to issue him a warning citation for improper lane usage. Ex. 4 at 21:00. By this time, Trooper Faulk has observed the suspicious circumstances and behaviors discussed previously, he knows that Defendant has lied to him about the whereabouts of his own truck, and he knows that Defendant's and Everett's stories about their travels are inconsistent. He informs Defendant that his red pickup truck is stopped at the next exit. *Id.* at 21:06. He then tells Defendant that he has caught Defendant and Everett in a lie, and that, although he is not under arrest, he can either cooperate and "knock this out," or everyone is going to jail. *Id.* at 21:40. After Defendant states that he has done nothing wrong, Trooper Faulk informs him that he is going to have Everett drive the white pickup truck to the next exit where both vehicles will be together. *Id.* at 22:00.

Trooper Faulk approaches Everett and directs her to drive the truck to a gas station at the upcoming exit fifty-eight. *Id.* at 23:35. She complies. *Id.* at 25:11. At the gas station, Trooper Faulk requests permission from Defendant to search the white pickup truck. *Id.* at 38:30. Defendant first gives consent for Trooper Faulk to search the maroon pickup, *id.* at 38:32, and upon further prompting, gives consent for Trooper Faulk to search the white pickup, *id.* at 38:39. A search of the white pickup truck begins at 40:50. Upon discovery of what was believed to be approximately ten kilograms of cocaine located in a

7

hidden compartment under the center console of the truck, Defendant and Everett are handcuffed and placed under arrest at 122:00.  *See* Tr. (Doc. 57) at 32:6-7.

## II.   DEFENDANT'S ARGUMENTS

Defendant moves the court to order suppression of "all tangible and testimonial evidence recovered as a result of an unlawful traffic stop and unreasonable detention."  Doc. 46 at 1.  Defendant argues that, because no traffic violation actually occurred, the initial stop of the white pickup truck was improper.  *Id*. at 3-5.  Further, Defendant argues that, even if there was a valid basis for the traffic stop, the stop evolved into an unlawful seizure because, in lieu of issuing Defendant a citation for the traffic violation, Trooper Faulk and other officers began an investigation which lasted approximately two hours before the discovery of the cocaine.  *Id*. at 5-7.

## III.   THE GOVERNMENT'S RESPONSE

In response, the Government argues that the initial stop was proper because Trooper Faulk had a reasonable and lawful basis for stopping the white pickup truck when he personally observed Defendant commit a traffic violation.  Gov't's Resp. (Doc. 52) at 4-5.  Further, the Government argues that the traffic stop was not unreasonably prolonged because the subsequent detention of Defendant was based on reasonable suspicion that he was engaged in criminal conduct.  *Id*. at 5-9.

## IV.   APPLICABLE LAW

The Fourth Amendment to the United States Constitution guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure."  U.S. Const. amend. IV.  In general, a seizure of the person, as

8

applicable to Fourth Amendment protections, occurs when police conduct would communicate to a reasonable person, taking into account the circumstances surrounding the encounter, that the person is not free to ignore the police presence and leave at his will. *United States v. Mendenhall*, 466 U.S. 544, 554 (1980).  Likewise, a search, as applicable to Fourth Amendment protections, occurs when a governmental employee or agent violates a person's reasonable expectation of privacy.  *United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("A search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.").  A seizure of property discovered as a result of such a search occurs when there is some meaningful interference with a person's possessory interests in that property.  *Id.*

Generally, the Fourth Amendment protects against unreasonable seizures.  U.S. Const. amend. IV.  In determining whether a seizure is reasonable, the type of encounter between police and the citizen determines the amount of Fourth Amendment scrutiny to be applied.  *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).  The Supreme Court has identified at least three levels of scrutiny to be applied to police-citizen encounters:

> (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny, *Florida v. Bostick*, 501 U.S. 429 (1991); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) technical arrests, full-blown . . . custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, *Brown v. Illinois*, 422 U.S. 590 (1975).

*Perkins*, 348 F.3d at 969.

The second category, investigative stops short of arrests—including traffic stops— is relevant in this matter.  Such stops are governed by *Terry v. Ohio*, and are subjected to

limited Fourth Amendment scrutiny requiring only a reasonable suspicion of criminal wrongdoing. 392 U.S. 1, 30 (1968). While such stops are "seizure[s] within the meaning of the Fourth Amendment," *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001), they are "constitutional if [they are] *either* based upon probable cause to believe a traffic violation has occurred *or* justified by reasonable suspicion as set forth in *Terry*." *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (per curiam) (citing *United States v. Chanthasouxat,* 342 F.3d 1271, 1275 (11th Cir. 2003)) (emphasis added). When determining if probable cause exists "to believe a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'" *Id*. at 1337 (citing *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999)). When determining if reasonable suspicion exists for a *Terry* stop, an officer may briefly stop and detain an individual for investigation if the officer reasonably suspects that criminal activity is afoot. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Reasonable suspicion, which is determined from the collective knowledge of all officers involved in the stop, demands "considerably less" than probable cause, but "police are required to articulate some minimal, objective justification for the stop." *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996); *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989). Courts look to the totality of the circumstances to ascertain "whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

*Terry* stops may not last "any longer than necessary to process the violation." *United States v. Holloman*, 113 F.3d 192, 196 (11th Cir. 1997). Unless the encounter becomes consensual, an officer's continued detention of a vehicle's occupants is authorized under the Fourth Amendment *only* if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *United States v. Griffin*, 109 F. 3d 706, 708 (11th Cir. 1997); *accord Holloman*, 113 F.3d at 196. In addition to the time restraints imposed upon *Terry* stops, an officer's actions during such a stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.

## V.     DISCUSSION

Applying the aforementioned case law, the undersigned concludes that Defendant's Fourth Amendment rights were not violated and, accordingly, his motion to suppress is due to be denied.

In short, the evidence adduced at the hearing establishes that Trooper Faulk had probable cause to stop the vehicle driven by Defendant based upon traffic violations observed by Trooper Faulk. Although the video evidence of any violation committed by Defendant is not conclusive, Trooper Faulk's testimony about what he observed is largely credible, the video evidence—which depicts the passing tractor-trailer move to the left to avoid Defendant's vehicle and further appears to support, or at least does not refute, Trooper Faulk's testimony that Defendant was "riding" on the fog line after the initial alleged violation—circumstantially supports Trooper Faulk's testimony, and even the explanation provided by Defendant for his actions appears to corroborate Trooper Faulk's

testimony about what he observed. As such, the undersigned finds that Trooper Faulk's initial stop was supported by probable cause to believe that Defendant committed a traffic violation.

This finding does not dispose of Defendant's motion, however. Defendant also argues that, even if lawful, the traffic stop of Defendant's vehicle "graduated to an unlawful seizure" due to Trooper Faulk's investigating criminal activity unrelated to the reason for the traffic stop as well as the overall length of the stop. Def.'s Mot. (Doc. 46) at 6. He argues as follows:

> In lieu of handing out the citation, and retrieving the documents such as proof of insurance, the truck's registration, and Mr. Ramos' license, Trooper Faulk, along with Officer Carswell, began an investigation which lasted nearly two hours before the discovery of the cocaine.
> . . .
> Even if there was reasonable suspicion to conduct a stop, as Trooper Faulk claims, that mission did not take 38 minutes [the duration of the stop at the point when Trooper Faulk sought consent to search the vehicle] to complete. As such, Mr. Ramos was subject to an unlawful seizure which violated his Fourth Amendment rights.

*Id.* at 7.

Defendant's argument is based, ostensibly, on the Supreme Court's recent decision in *Rodriguez v. United States*, 135 S.Ct. 1609 (2015). *See* Def.'s Mot. (Doc. 46) at 6-7. It is important to observe at the outset that *Rodriguez* explicitly does not announce a new or more expansive reading of the Fourth Amendment in the traffic stop context. Indeed, in that case, the Supreme Court professed to "adhere" to its prior precedents concerning the "tolerable duration of police inquiries in the traffic-stop context[.]" *Rodriguez*, 135 S.Ct. at 1612, 1614. In short, the Court held that "a police stop exceeding the time needed to

handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 1612 (quoting *Illinois v. Cabelles*, 543 U.S. 405, 407 (2005)). Accordingly, the Court held in *Rodriguez* that law enforcement violated the defendant's Fourth Amendment rights where, having completed the purpose of the traffic stop of Rodriguez's vehicle by issuing him a written warning and returning all of his documents, the police officer nevertheless continued to detain Rodriguez for an additional seven or eight minutes while he waited on a second officer to arrive before conducting a canine pass around Rodriguez's vehicle. *Id.* at 1613-16.[6]

Defendant observes that the "entirety of the stop at issue in *Rodriguez* lasted 29 minutes and was determined to be unconstitutional[,]" and, considering the thirty-eight minute duration of the stop at the time Trooper Faulk sought consent to search, asserts that "[t]here is no difference here." Def.'s Mot. (Doc. 46) at 7. However, Defendant's argument appears to insert a simple bright-line durational test that is not espoused in *Rodriguez* and, furthermore, ignores the very significant differences between this case and *Rodriguez*. In particular, unlike in *Rodriguez*, in this case the "question whether reasonable suspicion of criminal activity justified detaining [Defendant] beyond completion of the traffic infraction investigation," *Rodriguez*, 135 S.Ct. at 1616-17, is ripe for decision. To

---

[6] Notably, the Court did not examine whether the officer had "reasonable suspicion to continue Rodriguez's detention after issuing the written warning" because that issue was not decided by the Court of Appeals. *Rodriguez*, 135 S.Ct. at 1614, 1616-17.

13

that point, this court has before it a record demonstrating that, indeed, during the ordinary course of the traffic stop, Trooper Faulk's investigation developed reasonable suspicion that Defendant was involved in criminal activity such that Defendant's continued detention after completion of the traffic stop was permissible under the Fourth Amendment.

As the Court recognized in *Rodriguez*, during a traffic stop, a law enforcement officer "may conduct certain unrelated checks" provided that he "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 135 S.Ct. at 1615. In particular, the officer is permitted to make "'ordinary inquiries incident to [the traffic] stop.'" *Id.* (quoting *Cabelles*, 543 U.S. at 408). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citations omitted).

Here, the evidence before the court shows that, during the course of conducting precisely the sort of inquiries recognized as ordinary and lawful in *Rodriguez*, Trooper Faulk observed several suspicious circumstances that, consistent with his training, caused him to believe criminal activity was afoot, including the following: a) he knew the truck had originated from or passed through an area known as a source for drug distribution and that, since it passed through the Customs checkpoint in Falfurrias, Texas, the previous day, it had traveled almost continuously along a known corridor for drug trafficking in the direction of a narcotics "source" city (*see* Tr. (Doc. 57) at 81:11-20); b) the appearance of rusty, "staged"-looking tools in the bed of the truck (*see id.* at 16:1-11); c) the unusual nervousness and anxiety displayed by Defendant and Everett (*id.* at 21:11-12, 21:22-25,

14

24:1-8); d) the one-month insurance policy (*id.* at 22:21-23:20); e) the inconsistent statements given by Defendant and Everett respecting where they had been and where Defendant had picked up Everett (*id.* at 26:8-28:14); f) Everett's initial response that she did not know where the two were going (*id.* at 27:15-28:4); and g) the fact that Defendant lied about the whereabouts of his own truck, saying that it was in Houston when Trooper Faulk knew that it was traveling with the vehicle driven by Defendant (*id.* at 29:10-30:4). Cumulatively, these facts, which the record shows were learned by Trooper Faulk as he conducted the ordinary inquiries incident to a normal traffic stop and were all gleaned within twelve minutes of the beginning of the stop, provided Trooper Faulk with reasonable articulable suspicion to continue to detain Defendant while he investigated whether Defendant was involved in illegal drug trafficking.

Courts have routinely found sufficient reasonable suspicion in similar, and even less compelling, circumstances. *See United States v. Holt*, 777 F.3d 1234, 1257 (11th Cir. 2015) (affirming finding that police had reasonable, articulable suspicion sufficient to prolong traffic stop to investigate suspected illegal drug or currency smuggling where, *inter alia*, driver was "nervous breathing heavily, . . . had shaking hands," and driver and passenger "provided inconsistent statements about their recent travel"); *United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2005) (finding continued detention following traffic stop supported by reasonable suspicion where, *inter alia*, the driver provided an "implausible excuse for speeding," vehicle occupants provided discrepant "stories about the trip's length and purpose," "abnormal nervousness in both detainees," "lack of knowledge on the trip's destination," and "travel between two main source cities for

15

narcotics"); and *United States v. Thomas*, 621 F. App'x 622, 623 (11th Cir. 2015) (finding, after *Rodriguez*, that extension of traffic stop to perform canine sniff was supported by articulable suspicion where, *inter alia*, passenger "was breathing heavily even though she was only the passenger" and the passenger and driver "gave conflicting stories about where they were coming from").

Based upon all of the foregoing, the undersigned concludes that Defendant's Motion to Suppress is without merit and is due to be denied. The two arguments explicitly presented in the motion—that the initial stop was not supported by either probable cause or reasonable suspicion and that, notwithstanding the legality of any traffic stop, Defendant was unlawfully detained due to the duration of the traffic stop—are not supported by the factual record or the prevailing law, as set forth in this Recommendation.[7] At argument on the motion, Defendant presented a separate theory about the unconstitutionality of the stop. In essence, Defendant argued that the stop of Defendant's vehicle was "nefarious" and tainted by unconstitutional discriminatory profiling of Defendant due to the Hispanic surnames attached to the registration of the two pickup trucks and the fact that the trucks were registered in Texas. Tr. (Doc. 57) at 86:25-88:22, 98:15-99:17. However, Defendant conceded at the hearing that he could present no evidence of such discriminatory intent, and that, in essence, his argument is "more like a *res ipsa* argument." *Id.* at 99:21-25. Unfortunately for Defendant, the court is not permitted to indulge such speculative

---

[7] Defendant does not appear to argue that his consent to search was coerced or was not otherwise validly obtained, that the consent was revoked, that the search exceeded the scope of any consent granted, or that the search itself was unreasonably long. Accordingly, the undersigned has not considered such issues.

16

arguments in the absence of any supporting evidence. Furthermore, notwithstanding any biases Defendant would assign to Trooper Faulk, the record makes clear that Trooper Faulk meticulously gathered information during his rolling investigation, effected a traffic stop only after he observed what he believed to be a traffic violation, and, within applicable constitutional parameters, conducted an investigation which provided him with articulable, reasonable suspicion that Defendant was involved in narcotics trafficking before the traffic stop of Defendant's vehicle was prolonged in order to continue Trooper Faulk's investigation. Accordingly, there was no Fourth Amendment violation.

## VI.     CONCLUSION

For the reasons stated above, the undersigned RECOMMENDS that Defendant's Motion to Suppress (Doc. 46) be DENIED.

It is further ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **November 29, 2016**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir.

1982); s*ee Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

    Done this 16th day of November, 2016.

                                <u>/s/ Wallace Capel, Jr.</u>
                                UNITED STATES MAGISTRATE JUDGE